**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LILY S. by and through her<br>parents, Matthew S. and Tenisha S.<br><br>and<br><br>TENISHA S. and MATTHEW S. individually and on their own behalf, all of Downingtown, Pennsylvania,<br><br>Plaintiffs<br><br>v.<br><br>DOWNINGTOWN ACADEMY<br>LEARNING CENTER, INC<br>d/b/a a/k/a t/a Downingtown Learning Academy<br>d/b/a a/k/a t/a Downingtown Academy East<br>799 E. Lancaster Ave, Suite #3336<br>Downingtown, Pennsylvania 19335,<br><br>Defendant. | : | Civil Action<br><br>No.<br><br>Jury Trial Demanded |

**COMPLAINT**

## I. Introduction and Factual Background

1. Plaintiff Lily S. is a now four-year-old child with significant disabilities who has been historically diagnosed with Autism Spectrum Disorder and who was severely verbally, physically, psychologically, and emotionally abused and neglected by the Defendant from February 2025 through July 16, 2025, while a student at the Defendant Downingtown Academy Learning Center, Inc. (hereinafter, "Downingtown Learning Academy" or "DLA").

2. At DLA, Lily was repeatedly assaulted and subjected to abuse by at least one staff teacher, Chantelle James ("James"), who was an employee and/or agent of DLA and who was captured on camera on July 16, 2025, repeatedly dragging a then three-year-old Lily by the arm and shoving her into a chair.

3. Video evidence shows that Lily attempted to escape and James repeatedly grabbed her by the arm, lifted her off her feet, and slammed her into a chair.

4. Eventually James verbally berated and humiliated Lily, made her stand against a wall, and then sent her into a room for children under the age of two.

5. DLA failed to call the police or Lily's parents, Plaintiffs Matthew S. and Tenisha S. ("Parents" and with Lily, "Family"), immediately after the abuse.

6. DLA did not notify the Parents of the abuse during pick-up at the end of the school day, but instead called them 30 minutes after Lily was picked up from school.

7. The Parents then called the Pennsylvania Department of Human Services "Childline" to make a report of child abuse.

8. James was investigated by Childline, which found that the allegation of physical child abuse was founded.

9. James was fired by DLA.

10. Based on Lily's representations to her Parents as well as her dramatic change in behavior, the Plaintiffs believe and therefore aver that the July 16, 2025, incident was merely the tip of the iceberg and that verbal, physical, and psychological abuse began shortly after Lily enrolled in DLA in February of 2025 and continued for the approximately five months in which she was enrolled at DLA.

11. Lily reported to her Parents that her teachers or aides would "hit" her "on the head"; that "teacher is being mean to me;" or that "teacher shoved me into the little kids room" (referring to the daycare room for children under two years of age.)

12. Of course all of this conduct would have been observed by fellow employees of DLA and none of it was reported to the Parents, police, or Childline.

13. The Childline investigation revealed that multiple DLA employees admitted to the investigator that they observed James verbally abusing, humiliating, and intimidating not only Lily, but also other children at DLA and that those employees failed to report the abuse to Childline, the police, or other parents.

14. The abuse of Lily only ended because it was captured on video.

15. As a direct result of the abuse Lily experienced at DLA, she is now diagnosed with Post-Traumatic Stress Disorder (PTSD), according to Dr. Marc A. Gramatges, PsyD, ABPP, CBIS, a Forensic Neurorehabilitation Psychologist.

16. Dr. Gramatges diagnosed Lily with PTSD pursuant to a Psychological Evaluation, dated May 15, 2026.

17. The Defendant took no action to quell the abuse, investigate the source of Lily's behavioral changes, report abuse, or properly hire, train, or supervise this classroom to prevent ongoing abuse by staff, all in violation of Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131; and Pennsylvania law.

18. As a result, the abuse continued unabated until the Parents reported the abuse to child protective and law enforcement authorities.

19. The Defendant's continuing failures enabled its staff to terribly abuse Lily.

20. Although on notice of Lily's disabilities from the time of her enrollment at DLA, the Defendants took no actions to prevent abuse and grossly failed to fulfill the mandates and requirements of the ADA, Section 504, and Pennsylvania tort law.

21. This action is brought by minor Plaintiff Lily S. and the Parent Plaintiffs against the Defendant for the state torts of Negligence, Breach of Fiduciary Duty, and Vicarious Liability;

and for deliberate indifference to the physical assaults, verbal abuse, and psychological intimidation resulting in a denial of benefits and discrimination under Section 504 and the ADA.

22. In addition, because the Parent Plaintiffs entrusted DLA to care for their three-year-old daughter with special needs, and, in turn, DLA abused their daughter, the Parent Plaintiffs bring claims for Negligent Infliction of Emotional Distress (NIED). Parent Plaintiffs may bring a claim of NEID because there existed a special relationship between the Parent Plaintiffs and DLA where it was foreseeable that a breach of the duty to safely care for their daughter would result in emotional harm so extreme that a reasonable person should not be expected to endure the resulting distress.

23. Finally, Parent Plaintiffs bring a claim for Loss of Consortium because the Defendant's conduct has significantly diminished their companionship and relationship with their daughter.

## II. Parties

24. At all times relevant to this Complaint, the Plaintiffs resided within the Eastern District of Pennsylvania.

25. Defendant Downingtown Academy Learning Center, Inc. is located at 799 E. Lancaster Ave #3336, Downingtown, Pennsylvania 19335 d/b/a a/k/a t/a Downingtown Learning Academy, d/b/a a/k/a t/a Downingtown Academy East, Inc.

26. DLA is a daycare center that is certified to provide and/or host the provision of Early Intervention special education services to qualified students with disabilities and receives federal funds for the provision of such services. 20 Pa. Code § 14.155 (Range of Services).

27. At all times relevant to this Complaint, Defendant conducted business within the Eastern District of Pennsylvania.

28. The Defendant is the recipient of federal funds through multiple means, including, but not limited to, its cooperation with local school districts or intermediate units to provide or host early intervention or similar special education services, its provision of free or reduced cost breakfasts or lunches to low-income students, and/or through its receipt of Paycheck Protection Program (PPP) loans.

29. The Defendant is a place of public accommodation responsible for compliance with the guarantees of Title III of the Americans with Disabilities Act.

## III. <u>Jurisdiction and Venue</u>

30. This Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this case raises federal questions under Section 504 and the ADA.

31. This Court has supplementary jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367(a).

32. The amount in controversy, exclusive of interest and costs, exceeds $150,000.

33. Plaintiffs are not required to exhaust administrative remedies to pursue this Civil Action.

34. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391.

## IV. <u>Applicable Law</u>

### A. Discrimination and Denial of Benefits under Section 504

35. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits the exclusion of, or discrimination against, "handicapped persons" in federally funded programs.

36. Plaintiff Lily is such a "handicapped person" as she is a person with disabilities.

37. To state a claim under Section 504, a plaintiff must allege facts showing that: (1) she is an "individual with a disability" as defined under the statute; (2) she is "otherwise qualified"

for participation in the program or the benefit denied; (3) the program receives "federal financial assistance;" and (4) she was "excluded from the participation in," "denied the benefits of," or "subjected to discrimination" in the program "solely by reason of her or her disability." *Id.*

38. Compensatory damages are available for a Section 504 violation when the defendant's conduct demonstrates deliberate indifference. *Haberle v. Troxell*, 885 F.3d 170, 181 (3d Cir. 2018).

39. Deliberate indifference is "knowledge that a federally protected right is substantially likely to be violated," and that the defendant "fail[ed] to act despite that knowledge." *S.H. ex rel Durrell v. Lower Merion School Dist.*, 729 F.3d 248, 265 (3d Cir. 2013). The failure to act in the face of the requisite knowledge involves "a deliberate choice, rather than negligence or bureaucratic inaction," but it "does not require a showing of personal ill will or animosity toward the disabled person." *Id.* at 263 (internal quotations omitted).

40. Notably, a plaintiff "need not establish that there has been an intent to discriminate in order to prevail under Section 504." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1384 (3d Cir. 1991). Rather, "[t]hey 'may circumstantially allege that [the student] was discriminated against . . . by alleging facts that could be interpreted to show bad faith or gross misjudgment.'" *Beam v. Eastern Wayne School District*, 165 F. Supp. 3d 200, 211 (M.D. Pa. 2016).

**B. Discrimination under the ADA**

41. Title III of the ADA prohibits discrimination on the basis of disability in the activities of places of public accommodations. 42 U.S.C. § 12182(a).

42. For the purposes of Title III, it is discriminatory to deny an individual from participating in or benefiting from the goods, services, facilities, advantages, or accommodations a place of public accommodation. *Id*. at § 12182(b)(1)(A)(i).

43. Plaintiff Lily is a qualified individual with a disability under the ADA.

44. DLA is a place of public accommodation and subject to Title III of the ADA. 42 U.S.C. § 12181(7)(K).

45. "To state a claim of disability discrimination under Title III of the ADA, a plaintiff must show (1) discrimination on the basis of a disability; (2) in the full and equal enjoyment of goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation; (3) by the public accommodation's owner, lessor or operator." *Anderson v. Franklin Inst.*, 185 F. Supp. 3d 628, 642 (E.D. Pa. 2016) (citing *Harty v. Burlington Coat Factory of Pennsylvania, L.L.C.*, 2011 WL 2415169, at *9 (E.D. Pa. June 16, 2011) (internal citations omitted); *Dempsey v. Pistol Pete's Beef N Beer, LLC*, 2009 WL 3584597, at *3 (D.N.J. Oct. 26, 2009)).

**C. Negligent Infliction of Emotional Distress**

46. A plaintiff may bring a claim of Negligent Infliction of Emotional Distress where there exists a special relationship between the plaintiff and defendant where it was foreseeable that a breach of the duty would result in emotional harm so extreme that a reasonable person should not be expected to endure the resulting distress. *Toney v. Chester Cnty. Hosp.*, 614 Pa. 98, 100, 36 A.3d 83, 84 (2011) (plurality opinion affirming the order of the Pennsylvania Superior Court).

47. The Pennsylvania Supreme Court in *Toney* held that "if an actor has a particular contractual or fiduciary relationship with a victim and it is foreseeable that the actor's carelessness could cause severe emotional harm to the victim, and that harm occurs, a cognizable tort arises which is, in short-form, referred to as a breach of a "contractual or fiduciary duty" not to inflict foreseeable emotional distress upon a victim. *Id.* at 100 n.1.

## V. <u>Additional Factual Background</u>

48. The Plaintiffs incorporate by reference all paragraphs of this Complaint.

49. When the Parents toured DLA on or about February of 2025, they told the director of DLA that Lily was being evaluated for Autism and would likely receive an Autism diagnosis.

50. The director of DLA told the Parents that DLA would be able to safely and appropriately program for Lily despite her Autism diagnosis.

51. Lily began at DLA in late February of 2025.

52. Lily was diagnosed with Autism in late February or early March of 2025, and the Parents immediately shared this diagnosis with DLA.

53. In March of 2025, shortly after Lily started at DLA, the Director of DLA was fired; this firing was followed by several staff members quitting.

54. Shortly after starting at DLA, Lily's behavior changed dramatically and she began demonstrating significant mental health needs.

55. For example, after enrolling at DLA, Lily began demonstrating aggressive behavior towards her sister, which she previously did not demonstrate; she repeatedly told her Parents that she did not want to attend DLA; she would refuse to get dressed on days she had to attend DLA; she would kick her Parents in the mornings, but only mornings in which she was going to DLA; and she began exhibiting aggression to peers at DLA.

56. On April 14, 2025, she was seen at CHOP for an "unexplained change in mental state or level of awareness; or an episode of 'spacing out.'"

57. On April 15, 2025, she was seen for increased meltdowns, holding her breath, shaking after hitting her head on the ground, and crying.

58. By May 2025, she started becoming violent, hurting other children at school. There were several emergency visits with occupational therapy, but Plaintiff Tenisha S. struggled with

knowing what was going on as Lily could not communicate.

59. By May 10, 2025, DLA was complaining of increased urination, but Lily did not experience any toileting issues at home.

60. Lily was toilet trained when she began attending DLA; however, she began wetting her pants after attending DLA, most frequently while at school.

61. Lily wet her pants so often while at DLA that her Parents believed she had a urinary tract infection.

62. Lily would complain that her stomach and vagina hurt, which the Parents attribute to both extreme constipation and frequent accidents, respectively; Lily never made such complaints before starting at DLA.

63. On May 27, 2025, was seen for daytime and nighttime urinary incontinence and frequency that had been occurring for three weeks.

64. Lily was not physically aggressive with peers before starting at DLA.

65. However, on or about June 3, 2025, Lily was disciplined at DLA for hitting a classmate with a stick.

66. On June 4, 2025, she hit a child with a water bottle at DLA.

67. Thereafter, in early June 2025, Lily's parents pulled her out of daycare for a week. An emergency occupational therapy session was held, and discussions began between the therapist and DLA regarding a potential in-classroom session.

68. Around this time (early June 2025), Lily stated that a teacher was being "mean" to her, but she could not explain it in any greater depth because of her speech and language needs related to her autism.

69. Lily would cry every day when being dropped off at DLA and would resist entering

DLA to such a degree that the teachers, including James, would literally have to pull her away from her Parents to separate her from her Parents.

70. The Parents repeatedly warned the Defendant that Lily was experiencing significant behavioral changes.

71. On July 16, 2025, at DLA, Lily was repeatedly physically assaulted and subjected to physical, verbal, and psychological abuse by Chantelle James, who was an employee and/or agent of DLA.

72. James was captured on camera repeatedly dragging a then three-year-old Lily by the arm and shoving her into a chair.

73. At the time, Lily was a diminutive three year old, and James, a large, fully grown woman, towered over her.

74. Video evidence shows that Lily attempted to escape and James grabbed her by the arm, lifted her off her feet, and slammed her into a chair.

75. Lily returned to the toy she was playing with, and James picked her up by the arm a second time, lifted her off her feet, and slammed her into a chair.

76. Lily then returned again to the toy she was playing with.

77. Thereafter, James screamed at Lily, verbally berated and humiliated Lily, made her stand against a wall, and then sent her into a room for children under the age of two.

78. All of the above abuse was captured on video.

79. A new staff member who was training in the classroom observed the physical and verbal abuse but did not intervene.

80. The new staff member was afraid to confront James about the abuse.

81. Instead, the new staff member feigned going to the bathroom and reported the abuse

to the director of DLA.

82. The director of DLA called Childline to report the abuse, but did not call the police or the parents; nor did the director advise Lily's grandmother at pick-up that Lily had been abused.

83. The director waited until 30 minutes after the day ended to call the Parents to advise them of the abuse.

84. When Lily heard her parents discussing that they needed to return to DLA to retrieve Lily's belongings she screamed "I don't want to go back!"

85. The Childline investigator advised the Parents that DLA employees admitted to the investigator that James verbally abused, intimidated, humiliated, and harassed children at DLA.

86. James was investigated by Chester County Children Youth and Families, which found that James physically abused Lily while she was employed at DLA.

87. In addition, DLA was previously allegedly under investigation for past allegations of verbal and/or physical abuse, unrelated to Lily.

88. Unrelated to Lily, DLA was subject to both surprise and scheduled inspections by the Department of Human Services (aka Childline).

89. When the Parents asked Lily about the July 16, 2025, abuse, she was unable to talk about that particular incident.

90. However, Lily reported to her Parents that James would "hit me in the head" on other occasions.

91. James did not strike Lily in the head in the video of the July 16, 2025, incident; thus the Plaintiffs believe and therefore aver that James physically abused Lily on other occasions.

92. In addition, Lily told her parents that on multiple occasions James would "shove" her into the "little kids room."

93. Indeed, on several occasions at pick-up, the Parents picked up Lily from the room for children who were under the age of two.

94. The Plaintiffs believe and therefore aver that James would physically abuse Lily on other occasions by forcefully grabbing and dragging Lily, similar to the manner in which she abused Lily on July 16, 2025.

95. Throughout her time at DLA, Lily would consistently tell her Parents that James was "mean."

96. Lily also consistently told her parents that the other children at DLA would frequently hit, bite, slap, punch, scratch, and wrestle; when the Parents advised Lily's teacher of this, she dismissed the complaints as simply Lily's imagination.

97. However, Plaintiff Matthrew S. heard a different parent complain to the teacher about the exact same conduct (children frequently fighting).

98. The Plaintiffs believe and therefore aver that there existed in Lily's classroom an atmosphere of chaos, in which the teachers and staff members did not have control over the children, leading to the children being subjected to repeated physical altercations.

99. At DLA, the Defendant's staff, employees, and/or agents, physically and psychologically abused Lily, and this abuse was witnessed by employees of DLA who did not report the abuse to the Parents, the police, or Childline, despite being mandatory reporters.

100. The Plaintiffs believe and therefore aver that the Defendant's staff, teachers, employees, and/or agents physically and emotionally abused other similarly situated children with disabilities, in addition to Lily.

101. The Plaintiffs believe and therefore aver that Lily was forced to observe the Defendant's verbal, psychological, and/or physical abuse of her classmates.

102. After the July abuse, Lily attacked her sister, who is also a child with a disability (also autism); Lily bit her sister on multiple occasions and on one occasion put a blanket over her to smother her; the Parents never observed this type of aggressive behavior from Lily before she enrolled at DLA.

103. Lily is now diagnosed with PTSD as a direct result of the abuse she endured at DLA.

104. Lily's psychological trauma is so severe that Lily is now only able to discuss it after she takes Lorazepam (Ativan, an anti-depressant).

105. Lily was prescribed Ativan on an emergency basis in August 2025 because her mental health rapidly deteriorated.

106. Ativan acts like a sedative when she is experiencing an emotional meltdown.

107. Ativan is a benzodiazepine used to treat anxiety disorders and panic attacks.

108. The need to use Ativan (or any other benzodiazepine) in a child under the age of five is extraordinarily rare and is indicative of the extreme trauma response that Lily experienced at DLA.

109. Lily is prescribed Guanfacine daily to target her trauma, as well as liquid Lorazepam to use as needed for severe aggression.

110. She is also prescribed Clonidine to help her sleep.

111. And she is prescribed Gabapentin for anxiety and insomnia.

112. Lily was previously not afraid of the dark but now needs a nightlight and occasionally all of the lights on to fall asleep.

113. In September 2025, she was taken to the emergency room for worsening unsafe behaviors. She was hurting pets and family, intentionally urinating on the floor during episodes,

and self-harming by headbanging. She was intentionally urinating and having bowel movements in her underwear and laughed about it. Her Guanfacine dose was increased.

114. In the fall of 2025, the Parents had to rush Lily to the emergency room at the Children's Hospital of Pennsylvania Behavioral Services and Hershey Medical Center on three occasions because she was experiencing panic attacks and severe behavioral abnormalities the likes of which the Parents had not observed before Lily attended and was abused at DLA.

115. For example, in November of 2025, Lily's mental health deteriorated so much that she stopped eating and drinking; she even refused to eat cookies and other treats.

116. In the fall of 2025, Lily began seeing a psychologist through Blackbird Health.

117. The entire family, including the Parent Plaintiffs Matthew and Tenisha, began attending family therapy to process this trauma and the psychological repercussions that have affected them.

118. Lily also began receiving occupational therapy.

119. Lily has began seeing a CHOP Developmental Pediatrician, who has recommended Applied Behavioral Analysis (ABA) therapy for her.

120. Lily has continued to be terrified of unknown adults.

121. The Family passes DLA when it travels to the grocery store, and when they drive by DLA, Lily screams, cries, and begs her parents not to bring her to DLA.

122. Lily is emotionally labile, fearful, and depressed. She engages in self-harm and disruptive behaviors regularly (e.g., meltdowns, not eating, breath withholding, aggression, not wanting to be touched, kicking a door so hard the hinges bent and needed to be replaced, anger towards pets and sister, tantrums lasting over an hour, incontinence, hiding under the bed). She has sleep disturbances and is easily startled.

123. During Dr. Gramatges' evaluation of Lily in April of 2025, he administered the Behavior Assessment System for Children, Third Edition (BASC-3).

124. The results of the BASC-3 indicated that the Externalizing Problems Index was Clinically Significant overall and for Aggression, with At-Risk for Hyperactivity. Internalizing Problems Index was Clinically Significant overall and for both Depression and Somatization, with At-Risk for Anxiety, Depression. Behavioral Symptoms Index was Clinically Significant, with At-Risk scales for Attention Problems and Atypicality. Adaptive Skills Index was At Risk for Adaptability.

125. Dr. Gramatges concluded reported that Lily "was progressing with developmental milestones (i.e., potty training, being social). However, in late February 2025 after starting at Downingtown Learning Academy, there were significant emotional/behaviors disturbances due to the abuse she suffered."

126. In addition, he connected the abuse she endured at DLA to her on-going, pervasive psychological and educational needs: "Though she was removed from Downingtown Learning Academy in July 2025, Lily had already suffered trauma from abuse and now engages in self-harm and disruptive behaviors (e.g., meltdowns, not eating, breath withholding, aggression, not wanting to be touched, kicking a door so hard the hinges bent and needed to be replaced, anger towards pets and sister, tantrums lasting over an hour, incontinence, hiding under the bed). She has made some progress with different medication but was still struggling in school."

127. Dr. Gramatages concluded: "The abuse suffered by Lily while at Downingtown Learning Academy has directly caused her to suffer persistent trauma symptoms."

128. Dr. Gramatges expects that it will be difficult for Lily to effectively address her PTSD and Autism: "While interventions exist for any of these diagnoses individually, the

complication becomes the challenge of stemming from addressing all three at once."

129. Because of the PTSD caused by the Defendant, Lily will now require "intensive interventions and care," according to Dr. Gramatges:

> The trauma Lily suffered may impact her ability to be successful in school, socially, and eventually work. She has already struggled with different medications which will need to be adjusted through different developmental stages of her life. She will need school and in-home supports. This includes family support as they are overwhelmed by not just her behaviors but their own struggles learning of the abuse suffered by Lily. Given the multiple diagnoses and the trauma suffered, treatment should be expected to continue for years and at the very least the remainder of her education. This will include the need for an IEP and possibly supportive treatment as an adult.

130. Based on the reporting by Lily, the extreme behavior changes and extreme school avoidance Lily exhibited while attending DLA, as well as the extraordinary mental health needs she has exhibited immediately after leaving DLA, the Plaintiffs believe and therefore aver that the physical and psychological abuse was occurring consistently while Lily was enrolled at DLA and was not confined only to the instance of abuse on July 16, 2025.

131. No employee or agent at DLA took action in response to the psychological and physical abuse Lily experienced, and as a result the Parents believe and therefore aver that the abuse began shortly after Lily started at DLA and continued unabated until caught on camera and reported to authorities, James was removed from DLA, and Lily left DLA.

132. The Defendant's continuing failures enabled its employees or agents to continue to terribly abuse Lily and possibly her classmates as well.

133. The Defendant took no action to quell the abuse, investigate the source of the behavioral changes, or properly hire, train, and supervise this classroom or their agents or employees to prevent such ongoing abuse.

134. The Defendant failed to implement appropriate oversight and supervision of staff.

135. The Defendant knew or should have known that it needed to train and supervise its employees and agents concerning when it was appropriate to make physical contact with a student and how to appropriately and safely make physical contact with a student, particularly a child with disabilities.

136. The Defendant failed to adequately train its teachers, staff, employees, and agents as to:

a. when it is appropriate to restrain a child and/or make physical contact with a child;

b. how to appropriately and safely restrain a child and/or make physical contact with a child;

c. how to appropriately discipline children, particular children with disabilities;

d. how to follow policies, procedures, directives, and instructions, if any, concerning the restraint of children;

e. how to identify when a teacher or aide is improperly restraining a child;

f. when and how to identify and report suspected child abuse; and

g. how to adhere to the requirements of the statutes cited herein and Pennsylvania tort law.

137. The Defendant violated Pennsylvania law that prohibits excessive corporal punishment. 22 Pa. Code. § 12.5.

138. The Defendant failed to implement or enforce policies or procedures concerning restraints, physical contact with children, discipline, and/or corporal punishment.

139. Plaintiffs believe and therefore aver that there existed a persistent pattern of abuse

by the Defendant's employees or agents, as evidenced by the facts stated herein.

140. The abuse of Lily was sufficiently open and obvious and thus known by the Defendant.

141. The Defendants knew or should have known that it needed to have policies and practices in place concerning when and how employees and agents may make physical contact with, discipline, and/or restrain children.

142. The Defendant's employees or agents participated in, tacitly approved, and/or deliberately ignored the abuse for a period of several days, weeks, or months.

143. This custom and/or practice of deliberate indifference caused a violation of Lily's statutory rights, including the right to be free from discriminatory conduct under the ADA and Section 504.

144. Lily has suffered physical, emotional, mental, and psychological harm.

145. The trauma inflicted upon Lily by these events could and should have been avoided through the appropriate, necessary, and timely interventions required under the federal laws cited herein, and their state law counterparts.

146. Because of her PTSD, Lily is at a major increased risk of harm to develop additional mental health needs, the symptoms of which can manifest themselves at any point in her life.

147. Lily's mental, emotional, academic, functional, and physical well-being suffered greatly as a result of the harassment and abuse described herein.

148. The Defendant ignored its obligations to timely respond to staff abuse and harassment under the ADA, Section 504, and Pennsylvania law, and thus failed Lily through their negligence, deliberate indifference, and gross misjudgment.

149. The Parent Plaintiffs trusted the Defendant to educate and care for their daughter

safely because when Lily enrolled at DLA she was only one month past her third birthday and both parties knew that she was going to soon be diagnosed with autism; therefore, there existed a special and/or fiduciary relationship between the parties.

150. The Defendant owed a duty to the Parents keep Lily safe and to refrain from physically assaulting Lily.

151. The Defendant also owed a duty to the Parents to train its teachers, staff, employees, and agents as to when it is appropriate to restrain a child and/or make physical contact with a child; how to appropriately and safely restrain a child and/or make physical contact with a child; how to appropriately discipline children, particular children with disabilities; how to identify when a teacher or aide is improperly restraining or verbally harassing a child; when and how to identify and report suspected child abuse; and how to adhere to the requirements of the statutes cited herein and Pennsylvania tort law.

152. The verbal, psychological, and physical abuse of Lily breached that duty.

153. As any parent knows, it is foreseeable that the Defendant's breach of the duties described in the preceding paragraphs would result in emotional harm so extreme that a reasonable person should not be expected to endure the resulting distress.

154. The Defendant's carelessness caused severe emotional harm to the Parent Plaintiffs.

155. The Parent Plaintiffs experienced shock, severe emotional distress, grief, rage, humiliation, mental anguish, insomnia, anxiety, depression, extreme stress, nightmares, and sleeplessness.

156. The Parent Plaintiffs are prevented from performing their usual duties, occupations, avocations, and vocations, with a consequent loss of earnings and future earnings capacity and will

have to continue to seek psychological treatment and care.

157. More specifically, Dr. Gramatges reported that "[a]ll the disruptions from Lily's behaviors are impacting [Plaintiff Tenisha S.] with her own emotional trauma response," which Plaintiff Tenisha S. reported affects her "24/7."

158. Dr. Gramatges concluded that not only will Lily need in-home, school, and community supports, but the family will require supports as well "as they are overwhelmed by not just her behaviors but their own struggles learning of the abuse suffered by Lily."

159. In addition, the Parent Plaintiffs will require "psychoeducation and co-regulation training [to] equip parents to distinguish between ADHD impulsivity, autistic meltdowns, and PTSD trauma responses."

160. Dr. Gramatges stated that the Parents and Lily will require "Child-Parent Psychotherapy (CPP)[, which is] . . . tailored for early childhood to help process trauma within the safety of the caregiver relationship."

## VI. Claims

### Count I
### Discrimination and Denial of Benefits under Section 504
### (Lily S. v. Defendant)

161. Plaintiffs incorporate all paragraphs of this Complaint.

162. At all relevant times, the Defendant received federal financial assistance from several sources.

163. Plaintiff Lily is a handicapped person, i.e., disabled, under Section 504.

164. Despite her disabilities, at all times relevant to this Complaint, Plaintiff was otherwise qualified to attend Defendant's daycare program.

165. At all times relevant to this Complaint, Defendant knew of Plaintiff's disabilities

and associated disability-related needs as described in this Complaint.

166. The Defendant discriminated against Plaintiff on the basis of her disability and denied her the equal benefits of her program, by failing to provide her with a safe, appropriate, and properly supervised daycare program with properly hired, trained, and supervised professionals where she would be free from physical, psychological, and verbal abuse and trauma.

167. The Defendant had the duty and responsibility to ensure that Plaintiff's program was safe, appropriate, and properly supervised with properly hired, trained and supervised staff.

168. Plaintiff would not have been subjected to the injuries described in this Complaint if she had not been disabled.

169. Plaintiff was deprived of the equal benefits of her daycare program, and otherwise subject to discrimination, because of her disabilities.

170. The Defendant acted with deliberate indifference, bad faith, and/or gross misjudgment and violated Plaintiff's rights secured by Section 504.

171. "The Third Circuit has held that the inadequacy of training may itself serve as the basis for liability where it amounts to 'deliberate indifference.'" *Susavage v. Bucks County Schools Intermediate Unit No. 22*, 2002 WL 109615 at *7 (E.D. Pa. Jan. 22, 2002) (citing *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997)).

172. As a direct and proximate result of Defendants' violations of Section 504 as set forth above, Plaintiff was injured, and has suffered physical, mental, and emotional trauma, pain and suffering, separation from family and other relationships, humiliation, educational harm and loss, and loss of life's most basic pleasures. She has incurred and will continue to incur significant physical, mental, emotional, and behavioral harm, work loss, monetary loss, medical/treatment bills, humiliation, and is entitled to monetary damages stemming from the injuries she has suffered

due to Defendant's violations of Section 504.

173. As a result of these violations, Plaintiff continues to suffer injuries and damages as described herein.

**WHEREFORE**, Plaintiff Lily S. demands judgment in her favor against Defendant for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000), interest, costs; punitive damages; attorney's fees; and such other and further relief as this Court deems just and proper.

**Count II**
**Discrimination and Denial of Benefits under the ADA**
**(Lily S. v. Defendant)**

174. Plaintiffs incorporate all paragraphs of this Complaint.

175. The requirements for a claim under the ADA are similar to Section 504, except that under the ADA, a plaintiff's disability need be only one factor in causing the denial of benefits or discrimination at issue and a lower standard of causation is applicable. *See* 29 U.S.C. § 794(a); *see also* 42 U.S.C. § 12132; *Helen L. v. DiDario*, 46 F.3d 325, 330 n.7 (3d Cir. 1995); *Furgess v. Pa. Dept. of Corr.*, 933 F.3d 285 (3d Cir. 2019).

176. As set forth above, Defendant violated Section 504; thus, Defendant also violated the ADA.

177. Defendant is a place of public accommodation responsible for compliance with the guarantees of Title III of the Americans with Disabilities Act.

178. Plaintiff Lily S. is a handicapped person, i.e., disabled, under the ADA.

179. At all times relevant to this Complaint, Defendant knew of Plaintiff's disabilities and associated needs as described in this Complaint.

180. The Defendant discriminated against Plaintiff on the basis of her disability and

denied her the equal benefits of her program by failing to provide her with a safe, appropriate, and properly supervised program where she would be free from harm.

181. The Defendant had the duty and responsibility to ensure that Plaintiff's program was free of abuse and harassment at school and that she was not subjected to a hostile educational environment.

182. Plaintiff would not have been subjected to these injuries described in this Complaint if she had not been disabled.

183. Plaintiff was deprived of the equal benefits of her program, and otherwise subject to discrimination, because of her disabilities.

184. Defendants violated Plaintiff's rights secured by the ADA and 28 C.F.R. § 35.130, by its actions and inactions which: (a) subjected Plaintiff to discrimination, in violation of 28 C.F.R. § 35.130(a); and (b) limited Plaintiff in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving the aid, benefit, or service, in violation of 28 C.F.R. § 35.130(b)(1)(vii).

185. The Defendant acted with deliberate indifference, bad faith, and/or gross misjudgment and/or violated Plaintiff's rights secured by the ADA.

186. As a direct and proximate result of Defendants' violations of the ADA as set forth above, Plaintiff Lily S. was injured, and has suffered physical, mental, and emotional trauma, pain and suffering, separation from family and other relationships, humiliation, educational harm and loss, and loss of life's most basic pleasures. She has incurred and will continue to incur significant physical, mental, emotional, and behavioral harm, work loss, monetary loss, medical/treatment bills, and humiliation.

187. Lily is entitled to equitable and injunctive relief under Title III of the ADA in the

form of tuition payment by DLA to a daycare facility that can properly, safely, and equitably education children with Autism, like Lily.

188. As a result of these violations, Plaintiff continues to suffer injuries and damages as described herein.

**WHEREFORE**, Plaintiff Lily S. demands judgment in her favor against Defendant, equitable and injunctive relief under Title III of the ADA in the form of tuition payment by DLA to a daycare facility that can properly, safely, and equitably educate children with Autism, like Lily; attorney's fees; and such other and further relief as this Court deems just and proper.

**Count III**
**Negligence**
**(Lily S. v. Defendant)**

189. Plaintiffs incorporate all paragraphs of this Complaint.

190. At all times relevant to this Complaint, Defendant knew that: (a) Lily was a student with disabilities and knew of Lily's associated needs as described in this Complaint; (b) it was obliged to provide her with a safe, appropriate, and properly supervised program and environment; (c) the hiring, assignment, training and supervision of employees and agents for Lily was an inherently critical undertaking in light of her age and vulnerabilities stemming from her disabilities; (d) Lily's disabilities required that she be supervised and monitored carefully and only proper personnel assigned to her; and (e) Lily's disabilities made her more vulnerable and susceptible to abuse and injury.

191. At all times relevant to this Complaint, Defendant had a duty under Pennsylvania and federal law to: appropriately supervise and educate Lily; ensure that her program was safe, properly staffed, and supervised by appropriately trained and qualified individuals and free from unreasonable and foreseeable risks of harm; hire, train, supervise, discipline, staff, and retain

employees who could provide safe, secure, and adequate supervision of Lily; and refrain from taking or omitting unreasonable actions that would cause harm to Lily.

192. The Defendant owed Lily a duty of care to prevent the conduct alleged herein, because, under the same or similar circumstances, a reasonable, prudent, and careful person should have anticipated that injury to Lily or to those in a like situation would likely result from the foregoing conduct and inactions.

193. At all times relevant to this Complaint, Defendant breached its duty to provide Lily a safe, secure, and properly staffed program with reasonable care.

194. At all times relevant to this Complaint, Defendant breached its duty to adequately hire, train, supervise, and discipline its staff and its program.

195. Defendant acted with negligence, gross negligence, recklessness and/or indifference to the health and safety of Plaintiff and is liable for one or more of the following acts or omissions amounting to negligent or reckless conduct:

a. failing to properly hire, train, and supervise employees and agents;

b. failing to adequately protect Lily; and

c. failing to continually monitor and address the overall safety of its pupils.

196. Plaintiff's injuries were caused by Defendant's acts or omissions which were negligent, grossly negligent, reckless, and/or indifferent with respect to the care, custody, or control of her.

197. The actions and inactions of Defendant created an unreasonable risk of harm.

198. As a proximate result of the above-described conduct, Plaintiff Lily has suffered and continues to suffer physical injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life;

and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

199. She is now at manifestly increased risk to develop additional mental health needs because of this trauma.

200. Defendant's acts and omissions in failing to protect a child entrusted to their care shocks the conscious.

**WHEREFORE**, Plaintiff demands judgment in her favor against the Defendants for compensatory and punitive damages in excess of One Hundred and Fifty Thousand Dollars ($150,000), interest, costs and such other and further relief as this Court deems just and proper.

**Count IV**
**Breach of Fiduciary Duty**
**(Lily v. Defendant)**

201. Plaintiffs incorporate all paragraphs of this Complaint.

202. A fiduciary relationship existed between Defendant, including its employees, agents, and officers, and Lily, in that Lily reposed a special confidence in Defendant to the extent that Lily and Defendant did not deal with each other on equal terms, due to Lily's age and disabilities, as well as her dependence and justifiable trust on Defendant and its personnel.

203. Defendant breached that duty through its actions as set forth herein.

204. As a direct and proximate result of Defendant's breach of its fiduciary duty, Lily was injured, has suffered and continues to suffer injuries as set forth herein.

205. Lily has incurred and will continue to incur significant physical, emotional, behavioral harm and monetary damages stemming from the injuries she has suffered and continues to suffer due to Defendant's breach of its fiduciary duty.

**WHEREFORE**, Plaintiff demands judgment in her favor against the Defendants for

compensatory and punitive damages in excess of One Hundred and Fifty Thousand Dollars ($150,000), interest, costs and such other and further relief as this Court deems just and proper.

**Count V**
**Vicarious Liability**
**(Lily v. Defendant)**

206. Plaintiffs incorporate all paragraphs of this Complaint.

207. Defendant accepted Lily into DLA for compensation rendered by her or on her behalf.

208. Defendant owed a duty to Lily which was breached to her great detriment.

209. Defendant breached its duty to Lily by numerous acts and/or omissions, including the following:

a. Failure to provide adequate staffing in classrooms;

b. Failure to protect Lily from foreseeable harm arising from unsupervised or poorly trained staff;

c. Failure to select and retain only competent staff for supervising, disciplining, and educating children;

d. Failure to properly and appropriately supervise their agents, servants, employees and/or ostensible agents in the performance of their duties to teach and/or discipline children;

e. Failure to formulate, adopt and implement protocols, policies, and procedures to ensure student safety and to prevent the physical, verbal, or emotional abuse or harassment of children;

f. Failure to establish routine audits of staff, or other quality control measures, to ensure the children's safety; and

g. Failure to train staff on: when it is appropriate to restrain a child and/or make physical contact with a child; how to appropriately and safely restrain a child and/or make physical contact with a child; how to appropriately discipline children, particular children with disabilities; how to follow policies, procedures, directives, and instructions, if any, concerning the restraint of children; how to identify when a teacher or aide is improperly restraining a child; when and how to identify and report suspected child abuse; and how to adhere to the requirements of the statutes cited herein and Pennsylvania tort law.

210. At all times relevant hereto, Defendant had actual or constructive knowledge of the acts, omissions, and tortious conduct of their respective agents, servants, ostensible agents, and employees which formed the negligence described in this Complaint.

211. At all times relevant hereto, Defendant was aware of, or should have been aware of, the high degree of risk associated with poorly training and supervising employees and agents; nevertheless, Defendant acted with indifference to this risk.

212. As a direct and proximate result of the Defendant's negligence, carelessness, and recklessness, Lily suffered severe and permanent injuries including but not limited to those set forth hereinabove, including prolonged, severe, and unrelenting emotional distress, mental anguish, embarrassment, humiliation, and the loss of enjoyment of life and life's pleasures.

213. As a direct and proximate result of the aforesaid negligence, carelessness, and recklessness of the Defendant, Lily was required to undergo substantial medical care and treatment and other therapies, and incurred additional medical expenses, including out-of-pocket costs and other expenses, some or all of which were incurred to her detriment and loss.

214. As a direct, substantial and proximate result of the negligence, carelessness and recklessness of Defendant and/or their servants, employees, agents, and representatives, who were acting during the course and within the scope of their employment, Parent Plaintiffs expended sums of money for medical and hospital expenses to their financial loss and detriment and will be required to expend sums of money in the future for medical care and treatment.

215. As a direct, substantial and proximate result of the negligence, carelessness and the recklessness of Defendant and/or their servants, employees, agents, and/or representatives, who were acting during the course and within the scope of their employment, Plaintiff suffered permanent injuries.

216. Defendant increased the risk of harm and injury to Lily, including those injuries and losses described in this Complaint.

217. At all times material hereto, Defendant had the responsibility of ensuring that the rights of its students were protected.

218. The Defendant's responsibilities to Lily were non-delegable and they were directly liable for the deprivations infringed by any persons or entities under their control, direct or indirect, including their employees, agents, consultants, contractors and subcontractors, whether in-house or outside entities, subsidiaries, staff, principals, representatives, individuals, agencies caused by their policies, whether written or unwritten, or existing as common practices.

219. As part of its duties and responsibilities, the Defendant had an obligation to maintain its facility with adequate and competent staff and sufficient resources to ensure the safety of students.

**WHEREFORE**, Plaintiff demands judgment in her favor against the Defendants for compensatory and punitive damages in excess of One Hundred and Fifty Thousand Dollars

($150,000), interest, costs and such other and further relief as this Court deems just and proper.

**Count VI**
**Negligent Infliction of Emotional Distress**
**(Parent Plaintiffs v. Defendant)**

220. Plaintiffs incorporate all paragraphs of this Complaint.

221. By virtue of the Defendant's role in educating Lily, a three-year-old child with disabilities, there existed a special relationship between the Parent Plaintiffs and Defendant where it was foreseeable that a breach of the duty to care for Lily safely and properly train its employees would result in emotional harm so extreme that a reasonable person should not be expected to endure the resulting distress.

222. It was foreseeable that the Defendant's carelessness could cause severe emotional harm to the Parent Plaintiffs and such harm occurred.

223. As a direct and proximate result of the Defendant's negligence, recklessness, and/or affirmative acts or omissions Parent Plaintiffs suffered shock, severe emotional distress, grief, rage, humiliation, mental anguish, insomnia, anxiety, depression, extreme stress, nightmares, sleeplessness, loss of life's pleasures, loss of future earnings, and lost wages and earning capacity. Parent Plaintiffs have been, will continue to be, and in the future will be deprived of the assistance and companionship of one another, all of which has been and continues to be to their great detriment and loss.

**WHEREFORE**, Parent Plaintiffs demand judgment in their favor against Defendant for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000); punitive damages; interest; costs; and such other and further relief as this Court deems just and proper.

**Count VII**
**Loss of Consortium**
**(Parent Plaintiffs v. Defendant)**

224. Plaintiffs incorporate all paragraphs of this Complaint.

225. A loss of consortium claim is a distinct cause of action, and is what is known as a "derivative" claim, and the interest to parental consortium of an unemancipated minor child is protected by the Due Process Clauses of the Fifth and Fourteenth Amendments of the United States Constitution. *Darr Const. Co. v. W.C.A.B. (Walker)*, 552 Pa. 400, 408, 715 A.2d 1075, 1079-80 (1998); *see also Oare v. York County*, 768 F.2d 503, 509 n.7 (3d Cir. 1985); *McCurdy v. Dodd*, 352 F.3d 820, 830 (3d Cir. 2003); *White v. City of Vineland*, 2022 WL 16637823 at *1 (D.C. N.J. 2022) (Parents whose minor or unemancipated child has been injured as a result of unlawful state actions has a claim for a denial of their due process interest in the companionship of their minor child).

226. As a result of the Defendant's discriminatory conduct, gross misjudgment, bad faith, and deliberate indifference, Plaintiff Lily S. suffered damages, including, but not limited to, the physical and mental/emotional injuries and harms set forth herein, which greatly affected and harmed Lily's entire family mentally and emotionally, including her Parent, and disrupted and interfered with the parent-child relationship, including the relationship with Lily's sister.

227. As a result of the Defendant's discriminatory conduct, gross misjudgment, bad faith, and deliberate indifference to known acts of physical, psychological, and/or verbal abuse, the Defendant violated Section 504, the ADA, and/or state law.

228. Lily's family has endured tremendous emotional pain and suffering, trauma to their personal relationships, as well as economic harm.

229. Parent Plaintiffs seek redress for the loss and denial of their rights to the comfort, companionship and society (i.e., consortium) of one another as a consequence of the Defendant's failures to comply with federal and state law as referenced herein.

230. The harms Lily and her family have experienced from the violations of federal and state law by the Defendant as described herein all occurred in violation of Section 504 and the ADA.

231. Parent Plaintiffs have been and will continue to be deprived of the assistance and companionship of their daughter, all of which has been, continues to be, and in the future will be, to their great detriment and loss.

**WHEREFORE**, Parent Plaintiffs demand judgment in their favor against Defendant for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000); punitive damages; interest; costs; and such other and further relief as this Court deems just and proper.

## VII. Jury Demand

232. Plaintiffs demand a jury of twelve persons on all claims herein stated.

**WHEREFORE**, the Plaintiffs respectfully request the Court order judgment in their favor as follows:

A. assume jurisdiction over this action;

B. declare the Defendant's actions and omissions to be violative of Section 504, the ADA, and Pennsylvania law;

C. award compensatory and punitive damages for the Defendant's violations of Section 504 and Pennsylvania law;

D. award equitable and injunctive relief under Title III of the ADA in the form of tuition payment by DLA to a daycare facility that can properly, safely, and equitably educate children with Autism, like Lily;

E. order the Defendants to pay Plaintiffs their reasonable attorneys' fees and related costs; and

F. grant such other relief as this Court deems proper.

Respectfully submitted,

/s/ *D. Daniel Woody*
D. Daniel Woody, Esquire
ID No. 309121
*Woody Law Offices, P.C.*
110 W. Front Street
Media, Pennsylvania 19063
O: (610) 566-8770
C: (610) 453-4460
d.daniel.woody@gmail.com

/s/ *Ryan F. Curran*
Ryan F. Curran, Esquire
ID No. 313188
*The Curran Firm, P.C.*
200 East State Street, Suite 103
Media, Pennsylvania 19063
O: (610) 566-5300
C: (610) 620-5780
rcurran@thecurranfirm.com
Attorneys for Plaintiffs